UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERY PEMBERTON,

            Plaintiff,                      Civil Action No. 11-cv-12990

      v.                            District Judge John Corbett O'Meara
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

            Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 15]**

Plaintiff Shery Pemberton brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Social Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 10, 15), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and complies with the applicable rules and regulations. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

On October 23, 2007, Plaintiff filed an application for SSI and DIB asserting that she became unable to work on June 30, 2007. (Tr. 85-92.) The Commissioner initially denied Plaintiff's disability application on January 28, 2008. (*Id.*) Plaintiff then filed a request for a hearing, and on January 19, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") Allyn Brooks, who considered the case *de novo*. (Tr. 33-67; 13-22.) In a January 26, 2010 decision, ALJ Brooks found that Plaintiff was not disabled. (Tr. 13-22.) His decision became the final decision of the Commissioner on May 16, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. 2.) Plaintiff filed this suit on July 12, 2011. (Dkt. 1.)

### B. Background

Plaintiff was 54 years old on the alleged disability onset date. (Tr. 17.) She has a radiology certificate. (Tr. 42.) She worked as an x-ray technician and receptionist prior to her June 30, 2007 lay-off from North Oakland Medical Centers ("NOMC"). (Tr. 33.) After her lay-off, Plaintiff went back to school and earned her bachelors degree in health services administration. (Tr. 42.)

#### 1. Plaintiff's Testimony at the Hearing Before the ALJ

Plaintiff tore ligaments in her dominant right wrist in February of 1998 while lifting an x-ray cassette at work. (Tr. 33, 241, 290.) Following the injury, she had three surgeries in an attempt to regain the use of her right hand. (Tr. 33-34.) She testified that she has not fully regained the use of her right hand. (Tr. 34.) Despite this, she worked as a receptionist for NOMC starting shortly after her three surgeries – the last of which was in June of 2000 – until the hospital went bankrupt in 2007. (Tr. 34-36.) Plaintiff testified that she was unable to return to work as an x-ray technician

due to the need to lift x-ray films, which weighed as much as twenty pounds.  (Tr. 36.)  Plaintiff's job duties as a receptionist included greeting patients, directing patients to the proper departments, and installing and using a system on the computer to view x-rays.  (Tr. 35.)

Plaintiff also suffers from degenerative disc disease in her lower back.  (Tr. 37.)  She testified that her disc disease affects her ability to stand and sit for extended periods of time.  (*Id*.)  Plaintiff testified that she also has asthma and allergies that are triggered by weather, dust, mold, paint fumes, cats, grass and extreme temperatures.  (Tr. 38-39.)  She also suffers from insomnia and wears a hearing aid.  (Tr. 40-41.)

Plaintiff testified that after being laid off she went back to school and earned a bachelors degree in health services administration.  (Tr. 42.)  She has not found a job yet, however, because most of the positions in that field require further education.  (*Id*.)

### 2.  Medical Evidence

#### a.  Treating Physician Evidence

##### i.  Dr. Stephen Werner and Dr. William B. Kleinman

Plaintiff's primary treating physician with regard to her hand was Dr. Stephen Werner.   (Tr. 206-290.)  Plaintiff saw Dr. Werner from June of 1998 through December 29, 2004.  (Tr. 208-290.)

On or before July 30, 1998, Dr. Werner performed an arthroscopy and pinning of Plaintiff's wrist. (Tr. 217, 283.)  He indicated that Plaintiff would be unable to return to work for three months. (*Id*.)  Shortly thereafter, on August 19, 1998, Dr. Werner performed another arthroscopy and a debridement of Plaintiff's wrist.  (Tr. 215.)  He indicated that Plaintiff would be able to return to

work using one hand on August 24, 1998.[1]  (*Id*.)  On September 21, 1998, Dr. Werner removed retained hardware in Plaintiff's wrist.  (Tr. 288.)  On October 20, 1998, Dr. Werner removed Plaintiff's cast and indicated that Plaintiff could return to work with the limitation of using only one hand.  (Tr. 218.) Dr. Werner continued these restrictions on a "recheck" of Plaintiff's wrist on November 2, 1998 and November 16, 1998.  (Tr. 219-20.)

On January 11, 1999, Dr. Werner performed another surgery on Plaintiff's wrist.  (Tr. 221, 285-86.)  He subsequently filled out an Employee Work Status form on January 19, 1999, which indicated that Plaintiff was unable to work post-operatively for three months.  (Tr. 208.)  On February 19, 1999, he filled out a second work status form that indicated Plaintiff needed an additional six weeks of recovery. (Tr. 209.) On or before March 8, 1999, Dr. Werner removed three buried wires and rechecked Plaintiff's cast.  (Tr. 210, 289.)  He stated that Plaintiff could return to work on April 5, 1999.  (Tr. 210.)

Plaintiff saw Dr. Werner again on September 29, 1999.  (Tr. 211.)  On that date, Dr. Werner indicated that Plaintiff needed to restrict her work by using only her left hand to lift.  (Tr. 211.)  Dr. Werner did not indicate an end-date for this restriction.  (*Id*.)

On May 25, 1999, Dr. Werner saw Plaintiff for a "flare up of wrist pain" four months post reconstruction.  (Tr. 225.)  He put Plaintiff in a cast for four weeks and continued Plaintiff's work restrictions.  (*Id*.)  On June 15, 1999, he removed the cast and put her in a splint.  (Tr. 226.)  He again continued her restrictions.  (*Id*.)  He prescribed physical therapy and Celebrex for Plaintiff on

---

[1] Plaintiff's testimony seems to indicate that the hospital did not have a position that could accommodate this restriction, so Plaintiff received workers compensation benefits.  (Tr. 34-36.) Thus, while the Court refers to Plaintiff's restrictions upon return to work based upon Dr. Werner's medical records, it appears that Plaintiff did not actually return to work until 2000.  (*Id*.)

July 27, 1999, and continued her work restrictions. (Tr. 227-31.)

Plaintiff went to see Dr. Kleinman of the Indiana Hand Center regarding continued pain on January 26, 2000. (Tr. 154.) Dr. Kleinman noted that Plaintiff sustained a "torquing twisting injury to her dominant wrist, resulting in what was diagnosed as lunotriquetral instability." (*Id.*) Dr. Kleinman recommended surgery. Therefore, on June 19, 2000, Dr. Kleinman performed a third surgery on Plaintiff's right hand. (Tr. 159.) On August 7, 2000, Dr. Kleinman stated that Plaintiff could return to work "under a weightlifting restriction of less than five pounds on the right hand." (Tr. 156.)

Plaintiff returned to Dr. Werner on September 19, 2000. (Tr. 235.) That day, Dr. Werner reinstated Plaintiff's "one handed work only" restrictions; he then continued them on October 25, 2000, November 22, 2000, January 18, 2001, and March 27, 2002. (Tr. 235, 238-40, 243.) As of August 31, 2004, Plaintiff continued to have "significant pain in the right wrist." (Tr. 244.) Plaintiff was still on a "one handed work only" restriction as of December 29, 2004. (Tr. 247.) Indeed, Dr. Werner wrote a note for Plaintiff on that day that stated: "Patient will need to remain on the following restrictions: one handed work only." (*Id.*)

### ii. Dr. Rapp and Dr. Radden at Michigan Spine Institute

Dr. Rapp at the Michigan Spine Institute treated Plaintiff's back pain from September 1, 2005 through November of 2005. (Tr. 171-93.) On September 1, 2005, Dr. Rapp assessed Plaintiff and recommended a "mylogram of the lumbar spine" and an epidural steroid injection. (Tr. 177, 188.)

On September 15, 2005, Dr. Rapp reviewed Plaintiff's lumbar mylogram. (Tr. 181.) He noted a "slight bulge at C4." (*Id.*) He recommended getting "bilateral hip x-rays" and "epidurals

at the L3-L4 level." (Tr. 181, 191.)

On November 1, 2005, Dr. Rapp reviewed Plaintiff's lumbar mylogram and MRI films, and continued to recommend "conservative management only." (Tr. 182.) On December 7, 2005, Dr. Radden wrote a summary of Plaintiff's case for Plaintiff's primary physician – Dr. Brienbach. (Tr. 183-84.) He indicated that Plaintiff's back pain could be due to fibromyalgia. (*Id*.) On January 6, 2006, Dr. Radden wrote another letter to Dr. Brienbach this time indicating that the Spine Clinic intended to continue conservative management of Plaintiff's back pain. (Tr. 185-86.)

### iii. Genesys West Health Clinic

Plaintiff went to the Genesys West Health Clinic for routine health matters, including seasonal allergies, from November 4, 2008 through September 28, 2009. (Tr. 299-338.)

### iv. Dr. Shultz

Plaintiff saw Dr. Shultz of the Medical Rehabilitation Group on December 30, 2008 regarding her back pain. (Tr. 337-338.) He indicated that an MRI from November 24, 2003 demonstrated degenerative disc disease. (*Id*.) He recommended physical therapy. (*Id*.)

### b. Workers Compensation Independent Medical Examinations

Plaintiff filed for workers compensation benefits after her injury at NOMC. (Tr. 34-36, 297.) The record indicates that NOMC initially paid worker compensation benefits, and then subsequently accommodated Plaintiff's injury with a receptionist position. (Tr. 34-36.) Subsequent to NOMC's bankruptcy and Plaintiff's resulting lay-off, Plaintiff pursued workers compensation benefits again. (*Id*.) Therefore, on March 22, 2006, Dr. Kushner reviewed Plaintiff's medical records via an independent medical examination ("IME"). (Tr. 195-98.) Dr. Kushner recommended the following "permanent" work restrictions: no lifting over five pounds; no pushing or pulling over five pounds;

no repetitive wrist movements; no use of power tools or air motors or hammering; and writing and typing for short periods of time only. (Tr. 198.)

On November 21, 2009, Dr. Asit K. Ray evaluated Plaintiff on behalf of NOMC with regard to her workers compensation case. Dr. Ray stated that Plaintiff's hand was "functional for all practical purposes." (Tr. 205.) Specifically, Dr. Ray stated that Plaintiff "should be able to lift at least twenty pounds;" perform "sedentary work such as typing, telephone, computers, writing and lifting lighter objects or reasonably heavier objects." (Tr. 205.)

### c. State Disability Determination Service Evidence

On November 15, 2007, Dr. J.L. Tofaute examined Plaintiff on behalf of the state disability determination service. (Tr. 132-34.) During his physical examination of Plaintiff, Dr. Tofaute noted that Plaintiff's hands and wrists were a "normal color and temperature," without "significant swelling." (Tr. 133.) He also noted that Plaintiff was able to "make fists with both hands and to fully extend the fingers." (*Id.*) Lastly, he noted that Plaintiff "was able to alternately pick up small objects, such as coins, with both hands." (*Id.*)

On January 24, 2008, Consultant Robin Mika completed a Physical Residual Functional Capacity Assessment on behalf of the state disability determination service. (Tr. 139-47.) There is no evidence that Mika actually examined Plaintiff; rather it appears that Mika simply reviewed Plaintiff's medical file. (*Id.*) Mika concluded that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for about six hours in an eight hour day; sit for six hours in an eight hour day; push or pull on a limited basis; and occasionally use her right hand and frequently use her left hand. (Tr. 141.) Notably, Mika indicated that there was no treating physician statement in the Plaintiff's file. (Tr. 146.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since June 30, 2007– Plaintiff's alleged onset date due to her lay-off from NOMC. (Tr. 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: "injured right hand and wrist, allergies and asthma, degenerative disc disease of the spine." (*Id*.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 17.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work with the following restrictions: "occasional use of her right dominant upper extremity for lifting, reaching, feeling and fingering; and, full use of her left upper extremity; occasional crawling; never climb ropes/ladders/scaffolds; avoid concentrated exposure to extreme cold, and hazards such as machinery and all unprotected heights; and should avoid even moderate exposure to vibration." (Tr. 18.) At step four, the ALJ found that Plaintiff could perform her past relevant work as a receptionist. (Tr. 24.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal

quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

## F.  Analysis

Plaintiff has presented seven claims of error on appeal.  (Dkt. 10, Pl.'s Mot. Summ. J. at 2-3.) In substance, these claims can be summarized as follows: 1) The ALJ did not comply with the treating source rule; 2) The ALJ failed to give good reasons for discounting Plaintiff's credibility; 3) The ALJ's residual functional capacity assessment did not adequately account for Plaintiff's obesity, physical limitations, and allergies and asthma; and 4) The ALJ erred by not consulting a vocational expert.  (*Id.*) The Court considers these claims of error in turn.

### 1.  The ALJ Committed Harmless Error with Regard to the Treating Source Rule

Plaintiff argues that the ALJ failed to give Plaintiff's treating physicians controlling weight, and did not give good reasons for the various weights that he assigned to the various doctors. (Dkt. 10, Pl.'s Mot. Summ. J. at 2-3.)  The Commissioner argues that Plaintiff has "not identified any physicians who treated her during the time period at issue."  (Dkt. 15, Def.'s Mot. Summ. J. at 9.)

The treating-source rule generally requires an ALJ to give deference to the opinion of a claimant's treating source.  In particular, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); S.S.R. 96-2p, 1996 WL 374188 (1996).  And where an ALJ finds that a treating

physician's opinion is not entitled to controlling weight, he must then consider the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Id.*; 20 C.F.R. § 404.1527.

In addition, the treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record"). The purpose of this procedural requirement is two-fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *5.

In this case, the ALJ explicitly stated that Dr. Bannion from Genesys Health, Dr. Werner and Dr. Rapp were all treating physicians. (Tr. 23.) However, he did not give these three doctors' opinions controlling weight. (*Id*.) Instead, he gave these doctors' opinions "some weight" but assigned "great and/or significant weight" to the examining doctors, and "substantial weight" to

DDS consultant Robin Mika:

> As for the opinion evidence, the residual functional capacity is based in large part on Dr. Ray, a physical medicine and rehabilitation specialist, who was given great weight for his extensive examination of the claimant. . . . Dr. Kushner, Dr. Schultz, and Dr. Tofaute were all given significant weight for their extensive examinations of the claimant. . . . . The Disability Determination physicians, including Dr. Mika were given substantial weight as non-examining physicians with an extensive knowledge of disability requirements. Dr. Bannion, Dr. Rapp, and Dr. Werner, were also given some weight as treating physicians.

(Tr. 23.)

The Court also notes that the ALJ did not, as required, provide "good reasons" for the weight assigned to Plaintiff's treating physicians. Remand is generally warranted when an ALJ fails to give good reasons for the weight assigned plaintiff's treating physicians and fails to evidence that he even considered the weighting factors set forth in 20 C.F.R. § 404.1527. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009); *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Blakely*, 581 F.3d at 408); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (noting that the course of action for failure to comply with the "good reasons" requirement is now "well charted" in the Sixth Circuit: "when an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))).

Although not specifically raised by the Commissioner, the Court considers the harmless-error exception to the treating-physician rule. *See Wilson*, 378 F.3d at 547. This exception provides that a violation of the procedural requirement might be harmless error if (1) the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation." *Id*. Nothing suggests that the opinions of Drs. Werner – restricting the use of Plaintiff's right hand, Rapp – treating Plaintiff's back pain with epidural injections and indicating no restrictions, or Bannion – treating Plaintiff's seasonal allergies and indicating no restrictions – were so extreme or unsupported as to be patently deficient. And, the ALJ did not adopt Dr. Werner's functional limitations of one-handed work. (Tr. 18.) Rather, he stated that Plaintiff could occasionally "use her right dominant upper extremity for lifting, reaching, feeling and fingering." (*Id*.) Therefore, the Court must consider whether the ALJ met the goal of the treating source rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

As stated above, the Commissioner's main argument with regard to the ALJ's violation of the treating physician rule is that Plaintiff "has not identified any physicians who treated her during the time period at issue." (Dkt. 15, Def.'s Mot. Summ. J. at 9.) Plaintiff injured her wrist on February 28, 1998. (Tr. 33, 241, 290.) However, her onset date – the date that she was unable to work due to her injury – was June 30, 2007. (Tr. 110.) Pursuant to the regulations, Plaintiff must show that any disability continued until at least one year before she filed her application – October 23, 2006. 20 C.F.R. § 404.302(b)(3). The evidence that the wrist impairment continued until October 23, 2006 is less availing. (Tr. 133, 141, 195-98, 205, 229, 338.)

Dr. Werner stopped treating Plaintiff in December of 2004. Thus, his "opinion" was a little over 5 years old at the time of the hearing in this matter. The only medical evidence continuing until October 23, 2006 includes: 1) Documentation from Drs. Rapp and Raden indicating that Plaintiff had degenerative disc disease that could be managed conservatively; 2)Documentation from Genesys West Health Clinic regarding routine health visits, including visits for seasonal allergies; 2) Documentation from Dr. Shultz indicating that Plaintiff had degenerative disc disease that could be managed by physical therapy; 3) Documentation from Dr. Kushner indicating that Plaintiff could perform work with exertional limitations of five pounds; 4) Documentation from Dr. Ray indicating that Plaintiff could perform work with exertional limitations of twenty pounds; 5) Documentation from Dr. Tofaute indicating that Plaintiff "was able to alternately pick up small objects, such as coins, with both hands;" and 6) DDS Consultant Mika's opinion that Plaintiff could occasionally lift twenty pounds; frequently life ten pounds; stand or walk for about six hours in an eight hour day; sit for six hours in an eight hour day; push or pull on a limited basis; and occasionally use her right hand and frequently use her left hand. (Tr. 133, 141, 167-192, 195-98, 205, 229-338.) As indicated above, the ALJ gave these opinions more weight than Dr. Werner's opinion. (Tr. 23.) The Court believes that this violation of the treating physician rule is harmless, however, because the ALJ indirectly attacked Dr. Werner's opinion with the other, more recent, evidence on the record that contradicted Dr. Werner's dated evidence. (Tr. 133, 141, 167-192, 195-98, 205, 229-338.) Specifically, the ALJ pointed out that Dr. Ray's opinion was "the most recent independent medical evaluation." (Tr. 24.) In addition, the ALJ noted "the conservative nature of the claimant's course of treatment during the *time period related to this decision*." (*Id*. emphasis added.) Although the ALJ could have more explicitly attacked Dr. Werner's opinion, these two passages indicate that he,

at the very least, met the goal of the treating physician rule – to "let [the Plaintiff] understand the disposition of [her case]."  *Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *5.  As such, the ALJ's violation of the treating source rule was harmless.

The Court notes for the record that even if the ALJ had given Dr. Werner's opinions controlling weight, the outcome of the case would be the same.  Factually, if the ALJ gave Dr. Werner's opinions controlling weight, Plaintiff would arguably be on a permanent "one hand work only" restriction because Dr. Werner's last note in December of 2004 indicated that Plaintiff should "remain" on that restriction.   (Tr. 247.) Plaintiff performed her receptionist position for approximately two and a half years after this note.  (Tr. 247, 34-36.)  Therefore, the ALJ's finding at step four that Plaintiff could return to that position is not inconsistent with Dr. Werner's opinion. (*Compare* Tr. 24 and Tr. 247 and Tr. 34-36.)

### 2. *The ALJ Gave Good Reasons for His Credibility Assessment*

Next, Plaintiff claims that the ALJ erred in failing to give good reasons for discounting her testimony regarding being fully disabled.  (Dkt. 10, Pl.'s Mot. Summ. J. at 2-3.)

A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). However, an ALJ must not reject a claimant's "statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186.  In fact, the regulations

provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2.

In this case, the ALJ gave very specific reasons for discounting Plaintiff's testimony. (Tr. 23-24.) First, the ALJ pointed out that Plaintiff's testimony was inconsistent with her daily activities:

> Although, the claimant has a well documented history of a significant injury to her right wrist and hand, including three surgeries; it is difficult to consider her totally disabled when she is able to drive, cook, clean, shop, feed and dress herself, as well as perform her own personal hygiene. In addition, the claimant had been able to attend college, and receive a bachelor's degree in health services administration even with her impairments. The claimant's reported daily activities are inconsistent with her complaints of being totally disabled. The claimant worked for nine years after her wrist injury as a secretary/clerk at the same hospital where she had been injured. The hospital had provided this new position for her, which she was able to perform for nine years until she was laid off. The claimant

lost her position due to a layoff, not because she was unable to perform her job duties. Since that time, there has been no medical evidence showing that the claimant's wrist/hand injury has worsened; or that she had frequent asthma exacerbations; or that her back pain was so significant as to prevent basic work activities. Since the claimant was able to do this type of work for nine years, one can assume that she would also be able to perform the same type of light clerical/reception work now. In addition, the claimant herself stated that she is looking for employment in relation to her newly earned health service administration degree, and that is has been difficult for her to find such a job, as typically more education is required. The claimant earning her degree, and looking for a health services position does suggest that even the claimant believes she is capable of performing light office type work.

(Tr. 23-24.)

Second, the ALJ pointed out that Plaintiff's testimony was inconsistent with her recent treatment records:

Also, there has not been any treating source that has stated that the claimant is totally disabled, or is incapable of performing basic work activities. In the most recent independent medical evaluation, Dr. Ray stated that in terms of light work the claimant's right hand was perfectly functional; and that she was able to lift at least twenty pounds using the grip and keeping the wrist in an extended position.

(Tr. 24.)

These detailed explanations are supported by substantial evidence from the record. (Tr. 29-44, 102-09, 132-338.) Therefore, the ALJ complied with the regulations regarding assessing Plaintiff's credibility.

> *3.    Substantial Evidence Supports The ALJ's Residual Functional Capacity Assessment*

Plaintiff next argues that the ALJ's residual functional capacity assessment did not adequately account for Plaintiff's obesity, physical limitations, allergies and asthma. (Dkt. 10, Pl.'s Mot. Summ. J. at 2-3.)

First, with regard to obesity, S.S.R. 02-1p states: "An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. [Obesity] may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching." SSR 02-1p, 2002 WL 34686281, at *6 (S.S.A.).

The ALJ's RFC in this case incorporated some of these limitations. (Tr. 18.) Indeed, the RFC included a limitation on crawling and an outright prohibition on climbing ropes, ladders or scaffolds. (*Id*.) The ALJ's inclusion of these restrictions addresses Plaintiff's obesity. *See* SSR 02-1p, 2002 WL 34686281, at *6 (S.S.A.). More importantly, no physician – treating, examining or otherwise – identified *any* limitations caused by Plaintiff's obesity. (Tr. 132-338.) As such, substantial evidence supports the ALJ's inclusion of standard limitations with regard to Plaintiff's obesity within his RFC.

Second, with regard to Plaintiff's physical limitations, the ALJ's RFC is consistent with his evaluation of the opinion testimony. (*See* II.F.1. above.) In addition, like with obesity, no physician – treating, examining or otherwise – identified any limitations caused by Plaintiff's degenerative disc disease. (Tr. 132-338.) As such, substantial evidence supports the ALJ's decision not to include specific limitations with regard to Plaintiff's degenerative disc disease.

Last, with regard to Plaintiff's allergies and asthma, the ALJ included a restriction on Plaintiff's exposure to extreme cold. (Tr. 18.) As Defendant points out, this limitation could only be due to Plaintiff's testimony regarding her allergies and asthma. (Dkt. 15, Def.'s Mot. Summ. J., at 4.) And like Plaintiff's obesity and degenerative disc disease, no physician identified any limitations caused by Plaintiff's allergies and asthma. (Tr. 132-338.) As such, substantial evidence supports the ALJ's RFC.

### 4. The ALJ Did Not Need to Consult a Vocational Expert

Finally, Plaintiff argues that the ALJ erred by not consulting a vocational expert ("VE"). (Dkt.10, Pl.'s Mot. Summ. J., at *2-3.) The social security regulations state that an ALJ *may* consult a VE at step four, but is not required to do so. 20 C.F.R. § 404.1560(b)(2). The regulations state the following regarding the consideration of vocational factors at step four:

> If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.

20 C.F.R. § 404.1560(b)(3).

The ALJ determined, at step four, that Plaintiff was able to do her past work as a receptionist. (Tr. 24.) Substantial evidence supports this finding given that, post-injury, Plaintiff performed this work for at least seven years, and was able to get her bachelors degree. (Tr. 24.) Therefore, according to the regulations, the ALJ did not need to consult a vocational expert. 20 C.F.R. §§ 404.1560(b)(2) and (3).

### G. Conclusion

For the reasons set forth above, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and complies with the applicable rules and regulations. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: May 2, 2012


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 2, 2012.


s/Jane Johnson
Deputy Clerk